UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY L. PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:04CV0248 AGF |
| | ) |
| ALPHONSO R. JACKSON, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the parties' cross motions for summary judgment.[1] Plaintiff Larry Price, a former employee of the United States Department of Housing and Urban Development (HUD), filed this action pro se against Defendant Alphonso Jackson, Secretary of HUD, claiming that Defendant (1) breached a settlement agreement entered into by the parties to settle discrimination charges filed by Plaintiff against Defendant, by not promoting him as promised and by not making certain payments as promised; (2) retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 for engaging in protected activity; and (3) constructively discharged Plaintiff, also in violation of Title VII. For the reasons set forth below, HUD's motion for summary judgment shall be granted in all regards except for the claim that HUD breached the settlement agreement by not making the payments required thereunder. Plaintiff's motion for summary judgment shall be denied in its entirety.

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

# BACKGROUND

The record establishes that Plaintiff was employed as a Single Family Housing Specialist, "outstationed" from HUD's Denver, Colorado, Home Ownership Center, with a duty assignment in the St. Louis, Missouri, HUD Field Office. His job required him to travel, with his travel limited to the area served by the St. Louis Field Office (the Eastern portion of Missouri and several nearby counties in Illinois). Between 1998 and 2002, Plaintiff applied for several positions at a higher pay grade, including a position as a Construction Analyst in HUD's Real Estate Assessment Center (REAC). On each application for these promotions, Plaintiff indicated a request for a duty assignment in the St. Louis Field Office. Plaintiff did not receive any of the promotions, and he filed several administrative discrimination complaints against HUD claiming that as a white male he was subjected to reverse discrimination.

In mid-January 2002, HUD and Plaintiff entered into serious settlement discussions. HUD attorney Lois Hoover represented HUD, and Plaintiff was represented by attorney Charles Wiest throughout the process. As part of any settlement agreement, Plaintiff requested a retroactive promotion to a GS-13 position, indicating that he wanted the promotion to be in the St. Louis Field Office. Plaintiff declined one offer because he did not want to work under the supervisor involved. Plaintiff's proposal that he remain at his current job but be paid as a GS-13 employee was not acceptable to HUD. Ms. Hoover then asked Plaintiff if he wanted her to explore a GS-13 position with REAC. She explained that the REAC position had a high burn-out rate because of its extensive travel requirements. As set forth in her affidavit, Ms. Hoover explained to Plaintiff that

they (REAC) "already had a number of people who had burned out doing that much travel, and were not interested in taking on another employee unless the person already clearly understood how much travel was required." She recalled Plaintiff making some comment like, "I know what those guys do." He further stated that 80% travel did not pose a problem for him and asked Ms. Hoover to explore this possibility. Def.'s Ex. O. Thereafter, Ms. Hoover got authority to offer Plaintiff the position. The Settlement Agreement contains, as a separate paragraph, Plaintiff's agreement to the 80% travel requirement.

Taking the evidence in the light most favorable to Plaintiff, as the Court must do in considering HUD's motion for summary judgment, on January 25, 2002, Plaintiff presented Ms. Hoover with a hand written memo listing his settlement demands. Plaintiff's attorney attests that Plaintiff's Exhibit 20 appears to be a copy of this memo. Decl. of Charles Wiest at 7, Pl.'s Ex. 1. This memo includes as a demand, "Promotion to GS-13 Construction Analyst position REAC outstationed to St. Louis Hud [sic] Office with work assigned to the geographic areas covered by the St. Louis Field Office (i.e. Eastern ½ of the State of Missouri plus 7 Metro Counties in Illinois)." Later that same morning, Ms. Hoover advised Plaintiff and his attorney that she had received authorization to offer Plaintiff "a REAC position in St. Louis." Decl. of Charles Wiest at 8. She informed them that Plaintiff had to agree to travel up to 80% of the time.

Plaintiff agreed to this offer. Neither Plaintiff nor his attorney asked about the specific duties of the position, and Ms. Hoover did not inform Plaintiff that REAC Construction Analysts are required to travel nation-wide and have no physical presence in

their local Field Office.  The record is unclear as to whether or not Ms. Hoover knew at the time the specific terms and conditions of the REAC Construction Analyst position. Mr. Pilakowski attests in his affidavit submitted by HUD that he recalls Ms. Hoover called him and asked about Plaintiff coming to work for REAC as part of a settlement. He attests that he gave her an overview of the position, including the travel requirement, and that she said she would explain it to Plaintiff.  Mr. Pilakowski was later told by his supervisor that a settlement had been reached, and that Plaintiff would be assigned to REAC.  Def.'s Ex. K at 1-2.  Viewing this evidence in the light most favorable to Plaintiff leads to the conclusion that Ms. Hoover knew about the specific travel requirements of the REAC position when she told Plaintiff she was authorized to offer it to him as part of a settlement, but also that Plaintiff professed to understand what the REAC Construction Analysts did.

The written Settlement Agreement was drafted by both attorneys.  Plaintiff, Mr. Wiest, and Ms. Hoover signed it that day, January 25, 2002.  The Agreement was finally executed on February 13, 2002, when it was signed by the pertinent HUD official.  Under its terms, Plaintiff agreed to waive all claims of discrimination against HUD based on occurrences predating execution of the Agreement.  Section Four (a) of the Agreement provides as follows: "HUD shall retroactively promote Complainant to a Construction Analyst position, GS-0828-13, Step 6, effective date of this promotion to be January 4, 1998, with a duty assignment in the Office of Public and Indian Housing, Real Estate Assessment Center, outstationed in the HUD office, St. Louis, Missouri."  Def.'s Ex. J. Section Four (g) of the agreement specified that Plaintiff "understands and accepts the up

4

to 80% travel requirement of the Construction Analyst position to which he is being promoted."

Plaintiff was also to receive certain retroactive within-grade pay increases. Section Four (d) of the Agreement provided that based on these personnel actions, HUD would make Plaintiff "whole" by paying him back pay plus interest. In addition HUD agreed to pay Plaintiff a lump sum payment of $10,000 and to pay his attorney $141,000 as Plaintiff's fees and expenses. Section Seven of the Agreement also contained an integration clause that provided as follows: "This Agreement sets forth the entire Agreement between the parties thereto, and fully supercedes any and all prior Agreements or understandings between the parties hereto pertaining to the subject matter hereof." The Agreement expressly gave Plaintiff the right to revoke the Agreement within seven calendar days from the date of its execution.

On March 15, 2002, Plaintiff was contacted by Mark Pilakowski, Acting Deputy Director of REAC. Mr. Pilakowski had been involved in some of Plaintiff's discrimination charges against HUD. Mr. Pilakowski told Plaintiff to report to duty for his new position on Monday, April 8, 2002, at REAC headquarters in Washington, D.C., for the required 30-60 day training period. Mr. Pilakowski also described the job duties of a REAC Construction Analyst, telling Plaintiff that the travel involved entailed nation-wide travel four to five days a week, and that when not on travel status, the individual works from home. Plaintiff was also instructed to apply for a government travel credit card.

5

Plaintiff immediately sent an email to Ms. Hoover stating that he had agreed to 80% travel, but not to 80% nation-wide travel. He asked for an "acknowledgment to the Settlement Agreement" that clarified that his work assignment would be in the geographic areas serviced by the St. Louis Field Office. Plaintiff stated that absent this he would consider HUD's actions to be in a breach of the Agreement and "an obvious act of reprisal." Def. Ex. M.[2] In a reply email dated March 21, 2002, Ms. Hoover stated that she recalled that when she raised the 80% travel requirement with him, Plaintiff said that it was not a problem because he was divorced and had nothing to keep him in St. Louis. She added, "At no time did you state that you expected to travel only in the eastern half of Missouri." Id.

Several emails and letters were exchanged between Plaintiff, Ms. Hoover, and Mr. Pilakowski, including an email from Plaintiff dated March 28, 2002, to Ms. Hoover in which Plaintiff asked HUD for a period of a few days to consider revocation of the settlement agreement. Id. This request was denied, and on April 3, 2002, Plaintiff sent Ms. Hoover an email claiming that HUD had breached the Settlement Agreement, and that until the matter was resolved he intended to continue working in his current position. Def.'s Ex. S.

On April 4, 2002, Plaintiff's supervisor called him at home at about 10:30 p.m. and instructed him to clear out his desk and vacate his office in St. Louis the next day, Friday, April 5, 2002, since that was his last day as an employee of Single Family

---

[2] This exhibit includes several emails and letters.

Housing, and he was expected to report for training at REAC on Monday, April 8, 2002. Plaintiff requested to be and was placed on sick leave from April 8, 2002 through May 2, 2002. His sick leave balance was only 19 hours, and HUD officials made the determination to deduct the remainder of the requested sick leave from Plaintiff's annual leave balance. On April 9, 2002, a personnel specialist at HUD sent Plaintiff, at his request, a package of retirement forms, informing him to return them to her in Chicago, Illinois, upon completion. Plaintiff sent the completed forms to Washington, D.C., addressed to Mr. Pilakowski. Plaintiff's annual leave was thereafter extended to May 31, 2002, the date of his retirement.

Plaintiff's three claims against HUD are, in large part, intertwined. He further claims that HUD breached the Settlement Agreement by offering him a position that required nation-wide travel, that this breach was in retaliation for Plaintiff's past charges of discrimination, and that his decision to retire was a reasonably foreseeable response to HUD's retaliatory acts. Plaintiff adds other allegations as well. He claims that HUD also breached the Settlement Agreement by not paying him the full amount of the agreed-upon back pay and by not making required contributions to his retirement account. He claims that HUD retaliated against him by assigning Mr. Pilakowski as his supervisor; ordering Plaintiff to clean out his desk and vacate his office under conditions designed to humiliate him in front of his coworkers; ordering him to obtain a government credit card and threatening discipline if he did not; Mr. Pilakowski's failing to timely return or process Plaintiff's retirement application; and charging Plaintiff with 160 hours of annual leave.

For relief Plaintiff seeks a declaration of the meaning of section Four (a) of the Settlement Agreement; reinstatement with HUD as a GS-13 employee in the St. Louis Field Office with travel obligations consistent with the above declaration, under a supervisor to be mutually agreed upon; unpaid back pay, interest, and retirement contributions as specified in the Settlement Agreement; damages; and attorney's fees.

## ARGUMENTS AND EVIDENCE OF THE PARTIES

HUD argues that it complied with the terms of the settlement agreement by promoting Plaintiff to the REAC Construction Analyst position, despite Plaintiff's own belief that this position would require only regional travel. HUD asserts that all Construction Analysts in REAC travel four to five days a week nation-wide. In support of this assertion, HUD submits two affidavits of Edward Turner, who at all relevant times was the Special Assistant to the Director of REAC, with human resources management responsibilities. In the affidavit dated December 23, 2002, Mr. Turner states that the Construction Analyst position to which Plaintiff was assigned as a result of the Settlement Agreement was in the "Physical Assessment Sub System of REAC." These Construction Analysts "are a very unique group as they travel throughout the country on assignments providing quality assurance of contracted inspections." Mr. Turner asserts that these Construction Analysts are "outstationed from the Headquartered based organization" and that they live in many different areas. "They are not located in any field office; their locality pay is based on the nearest field office location." Def.'s Ex. L.

In the affidavit dated April 15, 2005, Mr. Turner similarly attests that the title Construction Analyst is common to several different organizations in HUD, with the

8

function of the position in REAC being unique. He attests that "Construction Analysts and general engineers with the Physical Assessment Subsystem, Quality Assurance (QA) group in REAC" travel quite extensively throughout the United States and United States territories. He further attests that all QA Construction Analysts receive software training in Washington, D.C. Def.'s Ex. P.

    HUD has also submitted an affidavit by Mr. Pilakowski, who attests that "[t]he training requirement, travel requirement, and lack of a workstation in a Field Office applied to Mr. Price are the same policies applied to any other newly hired CA in REAC." Def.'s Ex. Q. Ms. Hoover describes the settlement negotiations with Plaintiff and his attorney in her declaration dated April 15, 2005, also submitted by HUD. She states that had Plaintiff or his attorney questioned the duties of the Construction Analyst position prior to execution of the Settlement Agreement, she would have been happy to obtain the information for them. Def.'s Ex. O. HUD does not address Plaintiff's allegations that HUD breached the Settlement Agreement by failing to pay him all the back pay and interest due him and/or by failing to make required contributions to his retirement fund.

    With respect to Plaintiff's retaliation claim, HUD concedes that Plaintiff engaged in protected activity, but argues that such a claim cannot be based upon HUD's offer of the promotion of Plaintiff to the REAC position. HUD argues that because the position was in compliance with the Settlement Agreement, Plaintiff's promotion to the REAC position -- with its incumbent training and travel requirements -- cannot be said to be an adverse employment action, which is an element of a retaliation claim. HUD further argues that telling Plaintiff to vacate his St. Louis office was not an adverse employment action,

9

because the Settlement Agreement did not specifically provide that he would be able to continue work at his old office once he accepted the new position. Def.'s Memo at 17. HUD argues that calling Plaintiff at home was the least public way possible to tell Plaintiff to vacate his office, undermining Plaintiff's allegation that HUD acted in a way designed to humiliate him. HUD contends that it is entitled to summary judgment on Plaintiff's constructive discharge claim because Plaintiff cannot establish that the conditions of the REAC position, "the position he is claiming to have been constructively discharged from," were intolerable, because he never worked in that position. Def.'s Memo at 21-22.

In response (as well as in his own motion for summary judgment), Plaintiff argues that the REAC position offered to him violated the term in the Settlement Agreement that his promotion would be to a position "outstationed in the HUD Office, St. Louis, Missouri." He also argues that the "up to 80% travel" term was violated, as the REAC position requires 80% to 90% percent travel, or even 100% travel. Furthermore, Plaintiff argues that the REAC position was not in compliance with the Settlement Agreement because nowhere did the Agreement provide that Plaintiff would be working out of his house when not on travel status. He also asserts that Mr. Pilakowski verbally threatened him with disciplinary measures if Plaintiff did not apply for a government travel credit card.

Plaintiff recognizes that the Settlement Agreement is silent as to the location of the travel required. He argues that this silence "does not provide authorization for the Defendant to arbitrarily assign the location of the travel required." Pl.'s Memo in Resp. at 7. Plaintiff "disagrees" with HUD's statement that all Construction Analysts in REAC

travel four to five days a week to locations throughout the United States. He argues that HUD's exhibits in support of this statement constitute improper extrinsic evidence in an "after the fact" attempt to modify the terms of the Settlement Agreement. Plaintiff submits an exhibit which he maintains shows that the above statement by HUD is not accurate -- a March 2004 vacancy announcement for a REAC Construction Analyst position. The announcement notes two vacancies in the Fort Worth, Texas, "Duty Location" and that the position "is outstationed from Washington, D.C." Travel requirements of the position are listed as "Frequently." Pl.'s Ex. 18. Plaintiff notes that the announcement does not include a 30-60 day training requirement, and asserts that he was not informed of such a requirement during settlement negotiations.

Plaintiff asks the Court to strike Ms. Hoover's April 15, 2005 declaration (Def.'s Ex. O) on the grounds that it is improper extrinsic evidence, and that it was made in bad faith. Plaintiff points to Ms. Hoover's statements in other places in the record that the Settlement Agreement was drafted not by Plaintiff's counsel, as asserted in her declaration, but jointly by herself and Plaintiff's counsel. Pl.'s Memo in Resp. at 10-15.[3] In support of his constructive discharge claim, Plaintiff submits an affidavit from his doctor stating that he advised Plaintiff in May 2002 to retire to avoid the adverse affects his stressful work environment was having on his health. Pl.'s Ex. 60.

---

[3] The Court finds no basis to strike Ms. Hoover's affidavit. From a review of the record as a whole it is clear that Ms. Hoover provided Plaintiff's attorney with a form or template for the Agreement, and that Plaintiff's attorney filled in other terms and language.

11

In reply, HUD argues that even if Ms. Hoover were aware of all the job duties of the REAC Construction Analyst, she was under no duty to disclose them to Plaintiff, who was represented by counsel during the settlement talks and the drafting of the Agreement. HUD cites to Missouri law for the proposition that absent evidence of any concealment of facts that induced a party to act as it did, there is no duty to speak where the parties are engaged in arm's length settlement negotiations. HUD argues that the failure of Plaintiff and his attorney to make the appropriate inquiries and insure that the language they felt was critical was included in the Agreement does not translate into a breach of the Agreement on HUD's part.

Plaintiff counters that the record establishes "the infeasibility" of his inquiring about the job duties of the REAC Construction Analyst position. He argues that Ms. Hoover negotiated in bad faith and intentionally withheld unpublished information about the relevant job duties to place Plaintiff in a hostile environment where he would be forced to retire. Doc. #37 at 6-7.

## DISCUSSION

**Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all

12

reasonable inferences to be drawn from the record. Tademe v. Saint Cloud State Univ., 328 F.3d 982, 986 (8th Cir. 2003); Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir.), cert. denied, 124 S. Ct. 153 (2003). The court must not weigh evidence or make credibility determinations; the moving party bears the burden of showing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

When a motion for summary judgment is made and properly supported by evidence, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S.574, 587 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Because discrimination cases often turn on inferences rather than direct evidence, summary judgment should be "cautiously granted" in such cases. Jacob-Mua v. Veneman, 289 F.3d 517, 520 (8th Cir. 2002); see also Mayer, 318 F.3d at 806. The Court is mindful that pro se pleadings in a discrimination case must be construed "charitably." See, e.g., Shannon v. Ford Motor Co., 72 F.3d 678, 685 (8th Cir. 1996).

**Breach of the Settlement Agreement**

The claim that HUD violated the terms of the Settlement Agreement is governed by general rules of contract construction under Missouri law. See Gilbert v. Monsanto Co., 216 F.3d 695, 700 (8th Cir. 2000). "The guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent." Triarch Indus., Inc. v. Crabtree, 158 S.W.3d 772, 776 (Mo. 2005) (en banc). "The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms." Id.. Thus, under Missouri law, a settlement agreement is enforceable even where parties did not entertain the same objective views as to its meaning if the parties' objective manifestations of intent "produce a reasonably ascertainable objective meaning." Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc., 347 F.3d 1952, 1054 (8th Cir. 2003).

If a contract is unambiguous, the intention of the parties and the legal import of the language of the contract cannot be varied by parol or extrinsic evidence. Allison v. Flexway Trucking, Inc., 28 F.3d 64, 67 (8th Cir. 1994) (applying Missouri law to the terms of a release agreement). An ambiguity arises when there is uncertainty in the meaning of the words used in the contract. Lacey v. State Bd. of Registration for the Healing Arts, 131 S.W.3d 831, 839 (Mo. Ct. App. 2004). Whether a contract is ambiguous is a question of law. Allison, 28 F.3d at 67. If the court determines that a contract is ambiguous, resolution of the ambiguity is a question of fact for the jury. Id.

> In determining whether a contract is ambiguous, a mere difference of opinion as to the proper interpretation does not render the contract ambiguous as a matter of law. According to Missouri law, the court's

14

> role is to determine the intention as manifested not by what the parties now say they intended but by the document. In that inquiry, however, the court is justified in considering more than the mere words of the contract. The surrounding circumstances at the time of contracting and the positions and actions of the parties are relevant to the judicial interpretation of the contract. The evidence considered by the court, however, may not be used to vary, contradict, enlarge, modify, or curtail the written terms of the agreement.

Press Mach. Corp. v. Smith R.P.M. Corp., 727 F.2d 781, 784-85 (8th Cir. 1984) (internal citations omitted). "A contract is ambiguous only if its terms are susceptible to fair and honest differences." The Executive Bd. of the Mo. Baptist Convention v. Carnahan, ___ S.W.3d ___, 2005 WL 1262830, at * 8 (Mo. Ct. App. May 31, 2005) (quoted case omitted).

Here, taking the evidence in the light most favorable to Plaintiff, the record establishes that Plaintiff may well have not understood the job responsibilities of a REAC Construction Analyst before he signed the Settlement Agreement. Furthermore, Plaintiff indicated to Ms. Hoover prior to her offer of the position that he wanted his travel to be limited to the areas he traveled to in his current position, and she did not correct this misunderstanding. As noted above, the record is unclear as to whether or not Ms. Hoover knew during settlement negotiations the specific job duties of the position in question, other than that it entailed 80% travel. In considering HUD's motion for summary judgment, the Court must assume that she did know. It is also undisputed, however, that Plaintiff professed to understand the position.

In any event, Plaintiff's subjective intentions do not render section Four (a) of the Settlement Agreement ambiguous. This section provides that HUD was to retroactively

15

promote Plaintiff to a certain very specific job within a certain period of time, and HUD did so in a timely fashion. Nothing in this record suggests that a unique position was being created out of whole cloth pursuant to the Settlement Agreement. Rather, the record is clear that Plaintiff was to be promoted to a position that already existed within the HUD system -- a Construction Analyst in REAC outstationed from Washington, D.C., in St. Louis. The Agreement does not state that Plaintiff would have a duty assignment in St. Louis. It states that he would have a duty assignment in the Office of Public and Indian Housing, REAC. Consistent with one of Plaintiff's main objectives, the new position did not require Plaintiff to relocate from St. Louis.

The record establishes that the phrase "Construction Analyst position, GS-0828-13, Step 6, with a duty assignment in the Office of Public and Indian Housing, Real Estate Assessment Center, outstationed in the HUD office, St. Louis, Missouri," has a "reasonably ascertainable objective meaning." On this record, the evidence is uncontroverted that the terms and conditions of the position offered to Plaintiff were no different that the terms and conditions of other REAC Construction Analyst positions. The March 2004 vacancy announcement does not undercut this conclusion. There is no evidence that the type of details of which Plaintiff complains, such as the location of any training, would have been covered in such a posting.

Plaintiff's unfounded assumptions about what this phrase means do not control here. There is no indication in the record that Plaintiff thought HUD was creating a special position for him with terms and conditions different from all other REAC Construction Analysts. It is indeed unfortunate that Plaintiff did not obtain more information before

16

agreeing to the terms of the Settlement Agreement. Plaintiff could have asked for clarification of the terms and conditions of this existing HUD position to which HUD promised to promote him. His assertion that this was somehow unfeasible is unpersuasive. He also could have incorporated his understanding of the terms and conditions of the promotion into the Agreement. Indeed, he could have obtained further details after the Agreement was signed and rescinded during the recision period. That he did not do so does not change the fact that HUD complied with the terms of Four (a) of the Agreement.

In sum, Both Missouri law and the very terms of the Settlement Agreement itself lead to the conclusion that the unambiguous terms of the written Agreement supercede prior agreements and understandings of the parties. The Court concludes that HUD is entitled to summary judgment on Plaintiff's claim that HUD breached Section Four (a) of the Settlement Agreement.

In its motion for summary judgment, HUD has not addressed Plaintiff's claim that HUD breached section Four (d) of the Settlement Agreement by not paying him the full amount of back pay and other benefits contemplated by that section. Accordingly, summary judgment in HUD's favor cannot be entered on this claim. Nor has Plaintiff established his right to summary judgment on this claim.

**Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) his employer took adverse action against him; and (3) a causal link exists between the two occurrences. Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 632 (8th Cir. 2005); Tademe, 328 F.3d at 991-92.

17

Because there is no direct evidence of retaliation to support Plaintiff's claims, the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies. See Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1017-18 (8th Cir. 2005). Under this analysis, if the plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must rebut the presumption of retaliation with evidence of a legitimate, non-retaliatory reason for the challenged action. If the employer meets that burden, the employee may prevail by proffering evidence that the employer's reason was a pretext for retaliation. Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005); Strate, 398 F.3d at 1017.

Here, HUD concedes that Plaintiff engaged in protected activity, but argues that Plaintiff has not shown any adverse employment action because the REAC position to which he was promoted was in compliance with the Settlement Agreement. The Court's conclusion above on Plaintiff's breach of the Agreement claim precludes the argument that assigning Plaintiff to the REAC Construction Analyst position at grade GS-13 was an adverse employment action. Even if telling Plaintiff to clear out his desk and vacate his office constituted an adverse employment action, HUD has offered a legitimate, non-retaliatory reason for this action. In accordance with the Settlement Agreement, Plaintiff was assigned to a new position in HUD. He was told several times that he needed to report to his new position, but he refused to do so. There is no evidence in the record before the Court that this reason was anything but a legitimate reason for asking Plaintiff to vacate his current office on the Friday before the Monday that he was to begin his new position. Nor can the fact that HUD charged Plaintiff's time off as annual leave support a

retaliation claim, as the record is undisputed that HUD switched to annual leave when Plaintiff's medical leave was exhausted. Accordingly, HUD has established its entitlement to summary judgment on this claim.

**Constructive Discharge**

For similar reasons, the Court concludes that summary judgment in favor of HUD is warranted on Plaintiff's constructive discharge claim. "An employee is constructively discharged when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job." Tenkku v. Normandy Bank, 348 F.3d 737, 742 (8th Cir. 2003). "A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999). Whether working conditions are sufficiently objectionable to support a constructive discharge claim is determined by an objective standard, not the employee's subjective feelings. Meyers v. Nebraska Health & Human Servs., 324 F.3d 655, 660 (8th Cir. 2003).

Here, it can hardly be said that the working conditions of the REAC position were objectively intolerable to a reasonable person. Nor was the manner in which HUD informed Plaintiff as to when and where he needed to report to this position unreasonable. The fact that Plaintiff felt he had to resign due to stress from the situation essentially caused by his own misunderstanding of the duties of the position he agreed to accept, cannot form the basis of a constructive discharge claim.

19

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment [Doc. # 25] is **GRANTED in part and DENIED in part.** The motion is denied as to Plaintiff's claim with regard to back pay and pension contributions and granted in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment [Doc. # 31 ] is **DENIED**.

**IT IS FURTHER ORDERED** that, in light of the limited nature of the remaining issues, the August 1, 2005 trial setting is vacated. The Court shall hold a status conference on Wednesday, July 13, 2005, at 1:30 p.m., to discuss the proceedings necessary to resolve any remaining issues.

Dated this 6th day of July, 2005.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE